## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**KONSTANTIN SHVARTSER**

      Plaintiff,

v.

**EVELINA LEKSER,**
**SNOWPOINT CAPITAL, LLC,**
**SP FUNDING 452, LLC**
**MICHAEL SAVINO,**
**STEPHEN FOX, ESQ.,**
**S. FOX LAW GROUP, P.C.,**
**ARTHUR HOLMBERG, M.D.,**
**ALAN HERWECK,**
**RAOUL SILVER, and**
**JOHN DOES 1 THROUGH 10**

      Defendants.

Civil Action No.

### VERIFIED COMPLAINT

Plaintiff Konstantin Shvartser ("Plaintiff" or "Shvartser"), by and through his attorneys, Fox Rothschild LLP, brings this cause of action by way of Complaint against Defendants Evelina Lekser ("Lekser"), Snowpoint Capital, LLC ("Snowpoint"), SP Funding 452, LLC ("SP Funding"), Michael Savino ("Savino"), Stephen Fox, Esquire ("Fox"), S. Fox Law Group, P.C. ("SFLG"), Arthur Holmberg M.D. ("Holmberg"), Alan Herweck ("Herweck"), Raul Silver ("Silver") and John Does 1 through 10 (the "John Doe Defendants") (collectively "Defendants"), and in support thereof, avers as follows:

### PARTIES

1.    Plaintiff, Konstantin Shvartser, is an adult individual who resides at 63 Anadyrskiy Proezd, Apt. 88, Moscow, Russian Federation 129336.

2.     Defendant Evelina Lekser, Plaintiff's daughter, is an adult individual who resides at 7211 Austin Street, PMB 247, Forrest Hills, NY 11375.

3.     Defendant Snowpoint is a New Jersey limited liability company with a principal place of business at 190 Main Street, Hackensack, NJ 07601.

4.     Defendant SP Funding is a New Jersey limited liability company with a principal place of business at 190 Main Street, Hackensack, NJ 07601.

5.     Defendant Savino is an adult individual who resides at 7211 Austin Street, PMB 247, Forrest Hills, NY 11375.

6.     Defendant Fox is an adult individual residing at 247 Weaver Street, Apartment 11B, Greenwich, CT  06831.

7.     Defendant SFLG is a law practice owned by Fox with a place of business at 247 Weaver Street, Apartment 11B, Greenwich, CT  06831.

8.     Defendant Holmberg is an adult individual residing at 6 Ellin Drive, Greenwich, CT 06831.

9.     Defendant Herweck is an adult individual residing at 12 S. 11th Street, College Point, NY 11356.

10.     Defendant Silver is a notary public residing at 798 Elizabeth Street, #2, Ridgefield, NJ 07657.

11.     The John Doe Defendants are persons or entities that materially aided and abetted in the unlawful conduct complained of herein and whose names and identities are currently unknown to Plaintiff.

## JURISDICTION AND VENUE

12.     Federal subject matter jurisdiction exists pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff is a subject of the Russian Federation and Defendants are deemed residents of the States of New Jersey, New York, and Connecticut and the amount in controversy exceeds $75,000.

13.     This Court has personal jurisdiction over Defendants because a substantial part of the events or omissions giving rise to this Complaint occurred in the District of Columbia.

14.     Venue is proper in the federal judicial district for the District of Columbia pursuant to 28 U.S.C. 1391(b)(2) in that this action concerns, *inter alia*, real property located at 2150 Florida Avenue N.W., Washington, D.C. 20008.

## OPERATIVE FACTS

15.     On October 24, 2008, Plaintiff Shvartser and Defendant Lekser purchased, as joint tenants with right of survivorship, a property located at 2150 Florida Avenue NW, Washington, DC 20008 (the "Property").  *See* **Ex. "A",** Deed dated October 24, 2008.

16.     Plaintiff and Defendant purchased the Property with the intention of rehabbing, renovating, and ultimately "flipping" it for a profit.

17.     Although the Deed, on its face, reflects a consideration of only ten ($10.00) dollars, the actual consideration paid for the Property is $800,000.

18.     In connection with the acquisition of the Property, Plaintiff and Defendant borrowed the sum of $417,000 from Bank of America (the "BoFA Loan") which was secured by a First Mortgage on the Property (the "BoFA Mortgage").  *See* **Ex. "B",** Deed of Trust dated October 29, 2008.

19.     All other costs of acquisition over and above the BoFA Loan were funded solely by Plaintiff.

20.     Because Plaintiff is also a permanent resident of Russia, and was not present in the United States, he executed a limited Power of Attorney authorizing Defendant Lekser to execute documents related to the BoFA Loan and BoFA Mortgage.   *See* **Ex. "C",** Specific Power of Attorney dated August 14, 2008.

21.     This Specific Power of Attorney was limited in its terms and specified that it only applied to executing the BoFA mortgage.  *See id.*

22.     Because Plaintiff is a permanent resident of Russia, and English is not his first language, he relied on and trusted Defendant Lekser, who is located in the United States, to handle business related to the Property and to keep Plaintiff informed of its condition and the status of the parties' real estate investment.

23.     Between 2008 and March 12, 2013, Plaintiff contributed hundreds of thousands of dollars into repairs and improvements related to the Property.   A chart illustrating the magnitude of Plaintiff's contribution is attached as **Ex. "D".**

24.     On or about March 12, 2013, Plaintiff and Defendant Lekser entered into an "Owners [sic] Agreement" (the "Agreement") related to the Property.  *See* **Ex. "E"**, Owners Agreement dated March 12, 2013.

25.     Pursuant to the Agreement, Plaintiff agreed to finance additional renovation costs up to $200,000 and bring current the BoFA Mortgage which had become delinquent under Defendant Lekser's management.

26.     Plaintiff and Defendant Lekser further agreed that the Property would be sold and, after (i) repayment of the BoFA Loan and (ii) reimbursements of funds advanced by Plaintiff, the net proceeds from the sale would be divided as follows:  65% + $20,000 in favor of Plaintiff and the remaining sums, if any, to Defendant Lekser.

27.     Plaintiff and Defendant Lekser further agreed that the sale of the Property would be carried on without Defendant Lekser's further involvement.

28.     Following the execution of the Agreement, Plaintiff invested an additional $600,000 to finance various repairs and other expenses related to the Property as well as an additional sum of approximately $180,000 in mortgage and utility payments.

29.     On or about March 30, 2015, Plaintiff informed Defendant Lekser that he wished to list the Property for sale and recover his capital investment and the 65% plus $20,000 due to him under the Agreement.

30.     In response, upon information and belief, Defendant Lekser embarked on a fraudulent scheme to withdraw equity from the Property and thus frustrate Plaintiff's expectations as an owner and/or contractual counter-party under the Agreement.

## THE FRAUDULENT SNOWPOINT LOAN

31.     Specifically, in or around October 16, 2015, Plaintiff and her alleged paramour, Defendant Savino, sought a hard money loan in the approximate amount of $800,000 from Defendant Snowpoint.

32.     A hard money loan is an asset-based loan through which a borrower receives funds secured by real property.

33.     Hard money loans typically short term, involve high interest rates and reflect a high degree of underwriting risk.

34.     At the time, Defendant Lekser had no gainful employment or income from any source.

35.     Upon information and belief, Defendant Lekser held herself out as being "employed" by a company called Upstream Capital Advisors ("Upstream").

36.     However, Defendant Lekser never earned a single cent from any services rendered to Upstream, an entity run by Defendant Savino and her attorney and agent, Defendant Stephen Fox.

37.     At the time, Defendant Savino had no gainful employment or income from any source.

38.     Upon information and belief, Defendant Savino worked as a real estate broker through approximately 2008.

39.     Thereafter, Defendant Savino has had no demonstrable source of income.

40.     Nevertheless, despite having no verifiable income of any sort, Defendant Snowpoint agreed to lend money to Defendants Lekser and Savino.

41.     As part of the underwriting process, on or about October 16, 2015, Defendant Snowpoint issued a commitment letter addressed to Defendants Lekser and Savino.  *See,* **Ex. "F".**

42.     The commitment letter made no mention of Plaintiff or his interest in the Property.

43.     The commitment letter was executed by Defendant Lekser only (not Defendant Savino) and solely in her own right and not on behalf of Plaintiff.

44.     The commitment letter identifies only one borrower: Defendant Lekser, and makes no reference to or mention of Plaintiff.

45.     When signing the commitment letter, Defendant Lekser did not indicate that she was acting as attorney-in-fact for Plaintiff pursuant to any power of attorney.

46.     At the time, the Property was unoccupied and in a state of disrepair.

47.     Most of the construction and renovations up to that point had been handled by Defendant Lekser's second alleged paramour, Phillip Sandlin ("Sandlin").

48.     Upon information and belief, Snowpoint representatives visited the Property in or around August or September of 2015, and determined that in addition to working on the Property, Sandlin had been living there.

49.     Accordingly, at or around the time of the commitment letter, Defendant Snowpoint was aware of Defendant Lekser's claims that the construction in the Property had been overseen or handled by an individual who was also living in the Property.

50.     At the time, the Property had a value of $1,950,000 and was subject only to a $417,000 first mortgage which Plaintiff had gradually paid down.  *See,* **Ex. "G"**.

## THE FRAUDULENT LEASE

51.     Eager to lend, Defendant Snowpoint ignored the lack of any verifiable income or credentials on the part of Defendants Lekser and Savino and proceeded to underwrite a re-financing transaction.

52.     Critical to any successful underwriting was the establishment of a verifiable rental income stream relative to the Property.

53.     To that end, Defendant Snowpoint prepared an investment outline indicating that Lekser had secured a two-year triple net lease in place with a tenant for $12,000 a month and that there will be a "lease surety bond in place."  *See*, **Ex. "R".**

54.     The lease was a work of fiction.

55.     Defendants Lekser, Savino, and Fox manufactured a fictitious lease (the "Fraudulent Lease") purportedly dated October 1, 2015 between Lekser as the landlord and a person named Hon. Ambassador Lord William Holden, III ("Holden").  *See,* **Ex. "H".**

56.     Upon information and belief, Holden is a fictitious persona created by Defendants Lekser, Savino, or Fox or, alternatively, is a real individual whose identity was appropriated by the Defendants in furtherance of their illegal scheme.

57.     According to Defendants Lekser and Fox, Holden is an ambassador who had liquid bank assets in excess of $1 billion dollars.

58.     Nevertheless, as far as Plaintiff can determine, Defendants Lekser, Savino, and Fox had never physically met Holden, had no understanding of how Holden amassed his supposed wealth or ever reviewed or received a bank statement, personal financial statement or any other reasonable verification of income or assets from Holden.

59.     Defendant Snowpoint had actual and/or constructive knowledge that Holden was not a real or legitimate tenant and that the Fraudulent Lease was not worth the paper it was written upon.

60.     Although the Fraudulent Lease identified Holden an "Ambassador," no information could be obtained from the Department of State or any other legitimate source corroborating Holden's status as a United States diplomat or a diplomat of some other country to the United States.

61.     Furthermore, Defendant Snowpoint was informed by Defendant Savino that, because Holden was a diplomat, in addition to his own wealth, the country that he represented would assist in paying rent.  However, Defendant Snowpoint never inquired which country that might be or obtained any other verification from an embassy or consulate of any nation as to whether some foreign sovereign intended to guarantee the rent at the heart of Defendant Snowpoint's underwriting decision.

62.     Additionally, although the Fraudulent Lease identified Holden as a "Lord", no information was obtained verifying the origin or nature of Holden's supposed title of nobility.

63.     It should have been obvious to Defendant Snowpoint and its agents that the Fraudulent Lease was not a legitimate document or reflective of a legitimate leasehold.

64.     The Fraudulent Lease marked as Ex. "H" was initially signed by Holden as the *landlord*, not tenant.

65.     This Fraudulent Lease was prepared by Defendant Fox.

66.     By email dated November 18, 2015, Defendant Savino transmitted the executed version of the Fraudulent Lease to Snowpoint's representative, Scott Vandersnow, on November 11, 2015 at 11:58 a.m., approximately 1 week *after* the re-financing transaction had already closed. *See*, **Ex. "I".**

67.     Notably, Defendant Lekser had not executed the lease marked as Exhibit "H".

68.     In response, Defendant Snowpoint indicated that (i) this was not the correct lease as the tenant had mistakenly signed the document as the landlord; and (ii) Snowpoint "thought there was a fully executed one where the utilities language was being reworked." *See,* **Ex. "J".**

69.     Less than one hour later, Defendant Fox transmitted a new version of the lease where Holden's signature was superimposed onto the "tenant" block and where Lekser now signed as a Landlord.

70.     It was not reasonable for anyone to believe that the tenant, Holden, had executed a new lease in the span of less than 1 hour.

71.     It was similarly not reasonable for anyone to believe that the lease was a legitimate document given the fact that the signatures on the document had been manipulated with the aid of computer software.

72.     Notably, Defendant Lekser did not sign as an attorney-in-fact for Plaintiff, nor is Plaintiff identified as a landlord despite the fact that he is a record owner of the Property.

73.     Holden's signature was affixed to the Fraudulent Lease by Defendant Fox, who was both Defendant Lekser and Defendant Savino's attorney, and who claims to have had "verbal" authorization from Holden to sign his name to any and all documents.

74.     Thus, as set forth more fully below, Snowpoint underwrote and ultimately closed upon the re-financing transaction sought by Defendants Lekser and Savino without ever (i) verifying Holden's identity; (ii) corroborating Holden's ability to pay; (iii) seeing the fully executed lease as part of the closing package; and (iv) with knowledge that the Fraudulent Lease was a dubious document.

75.     Furthermore, upon information and belief, Snowpoint underwrote and closed on the re-financing transaction without ever obtaining proof of the "lease surety bond" reflected in the Investment Outline referenced above.

76.     The fictitious nature of the lease was not the only red flag ignored by Snowpoint in the underwriting and closing process.

## THE FRAUDULENT POWER OF ATTORNEY

77.     Throughout the entire transaction, from the very first contact to the closing which took place on November 11, 2015, Defendant Snowpoint had absolutely no contact of any kind with Plaintiff.

78.     Instead, the entire transaction proceeded under a fraudulent Power of Attorney dated April 7, 2015 (the "Fraudulent Power of Attorney") purporting to give Defendant Lekser authority to ". . . execute and deliver each and every document required to refinance, sale, loan

and/or collateralize the Property Address, including but not limited to, a Deed of Trust and Note, and/or mortgage agreement.  *See* **Ex. "K"**, Specific Power of Attorney dated April 7, 2015.

79.     The Fraudulent Power of Attorney was a dubious document that contained material irregularities that should have given any reasonable lender pause.

80.     First, although the Fraudulent Power of Attorney was purportedly made on April 7, 2015, Defendant Snowpoint never requested or received the document until the moment of closing on November 11, 2015.

81.     Second, in the days leading up to the November 11, 2015 closing, even Defendant Snowpoint's representatives expressed concerns over Lekser's intentions and/or authority to re-finance a transaction without Plaintiff's express authorization.

82.     In an email dated November 4, 2015 at 11:24 a.m., Craig Sacks, Esq., an attorney retained by Defendant Snowpoint, expressed the view that "a POA was recorded at the time of purchase.  If they're thinking that it can be used, it can not.  It was specific to the purchase." *See,* **Ex. "L".**

83.     Thus, one (1) week prior to closing, Defendant Snowpoint had (i) not received any document verifying Defendant Lekser's authority to close; (ii) raised questions about Defendant Lekser's ability to utilize a years-old power of attorney used to purchase the Property as proof of authority to re-finance the Property in 2015; and (iii) signaled that some other document or form of Power of Attorney would be needed to close.

84.     The Fraudulent Power of Attorney was prepared during the period between November 4, 2015 and November 11, 2015, the date of closing.

85.     The Fraudulent Power of Attorney involved a cast of characters associated with Defendants Lekser, Savino and Fox.

86.     For example, the Fraudulent Power of Attorney is purportedly witnessed by Defendant Holmberg.

87.     Defendant Holmberg is an acquaintance of Defendant Fox.  Holmberg serves as a camp physician for a Boy Scout troop in Greenwich, CT.  Defendant Fox is the solicitor to the Boy Scout troop.  Both live near each other in Greenwich, CT.

88.     Furthermore, the Fraudulent Power of Attorney is purportedly witnessed by Defendant Alan Herweck. Defendant Herweck is a pizza shop owner in Queens, New York and is an associate of Defendant Savino.

89.     The Fraudulent Power of Attorney contains a "Notary Public Acknowledgment" purportedly made by Defendant Raul A. Silver, a Notary Public in Dutchess County, New York, an area in Upstate New York approximately 90 miles North of New York City.

90.     Yet according to the Notary Public Acknowledgment, Defendant Silver, a Dutchess County, New York Notary drove down to Queens, New York to acknowledge the signatures of witnesses from Connecticut and College Point, New York on a Washington, DC facing power of attorney made by a Russian national to his daughter.  Any reasonable lender confronted with a power of attorney containing such inexplicable irregularities would pause and, at a minimum, independently contact the principal and verify that the agent was authorized to act.

91.     Indeed, Defendant Silver is a former business acquaintance of Defendant Savino. The two worked together in a real estate brokerage that Defendant Savino joined prior to the 2008 financial crisis.

92.     Third, upon presentation at the closing, it should have been evident that the Fraudulent Power of Attorney contained material irregularities.

93.     For example, without limitation, the Fraudulent Power of Attorney (i) indicated that the document consisted of three (3) pages when, in fact, it consisted of two; and (ii) referenced an Exhibit "A" when, in fact, no Exhibit "A" was attached.

94.     Fourth, when Defendant Snowpoint sought to record the Fraudulent Power of Attorney, the clerk of the Recorder of Deeds initially rejected the document on grounds that Plaintiff's "signature on the POA appears to be a copy."  *See,* **Ex. "M".**

95.     Nevertheless, somehow, Defendant Snowpoint and/or its agents convinced the Recorder of Deeds to accept and record the Fraudulent Power of Attorney, possibly by presenting a "certified copy" of the document attested to by a Maryland notary public.  *See,* **Ex. "N".**

96.     At no point did Defendant Snowpoint ever attempt to contact Plaintiff to verify whether he was aware of the $800,000 re-financing transaction or whether he had, in fact, given a power of attorney to Defendant Lekser.

97.     Thus, on or about November 6, 2015, Defendant Snowpoint formed Defendant SP Funding and agreed to serve as SP Funding's managing member.

## **THE FAKE PROMISSORY NOTES**

98.     On or about November 11, 2015, Defendants refinanced the BoFA Mortgage with SP Funding assuming the position of first lender.  *See* **Ex. "O"**, Deed of Trust dated November 11, 2015.

99.     Unlike the 2008 BoFA Mortgage, the SP Funding transaction is *not* a thirty (30) year mortgage and the maturity date, according to the Deed of Trust, was December 1, 2016.

100.    Upon information and belief, approximately one-half of the proceeds of the refinancing transaction were used to pay off the first lien established by the BoFA mortgage.

101.    The remaining half – or approximately $400,000 – was taken as a "cash out" meaning that Defendant Lekser appropriated the funds for her use and benefit without Plaintiff's knowledge or consent.

102.    According to the HUD-1 from the re-financing transaction, Defendant SP Funding retained $50,000 from the proceeds of the transaction to cover interest reserve and/or the first six (6) months of mortgage payments.

103.    The rest of the proceeds were taken out and retained by Defendants Lekser, Savino, and Fox through fraud.

104.    Defendant Fox drafted three (3) fake promissory notes (the "Fake Promissory Notes") between Upstream and Lekswer under which Lekser purportedly "borrowed" $132,000 from Upstream.  *See,* **Ex. "P".**

105.    Upstream is an entity purportedly beneficially owned by Holden but which operated through Defendants Fox and Savino.

106.    Defendant Fox considered Upstream, Defendant Savino, and Defendant Lekser to be clients of Defendant SFLG regardless of conflicts of interest.

107.    Defendant Fox prepared the Fake Promissory Notes knowing that they lacked economic substance.

108.    Upstream never advanced any money, let alone $132,000 to Defendant Lekser and, similarly, Defendant Lekser never received or truly borrowed the funds.

109.    The Fake Promissory Notes were not secured by a mortgage on the Property.

110.    Defendant Snowpoint knew that, at a minimum, the Fake Promissory Notes reflected a related party transaction.

111.    The Fake Promissory Notes were signed by Defendants Lekser and Savino who, upon information and belief, were known by Snowpoint to be either alleged paramours or engaged to be married.

112.    Furthermore, at the time, Upstream maintained a website (the "Upstream Website") that listed Defendant Fox as its general counsel.  *See,* **Ex. "Q".**

113.    Notably, the Upstream Website also identified none other than "Lord" Holden, the tenant under the Fraudulent Lease, as Upstream's Chairman.

114.    Defendant Snowpoint did not verify whether the Fake Promissory Notes reflected a legitimate indebtedness.

115.    Defendant Snowpoint did not inquire into the economic substance underlying the leases and promissory notes that involved the same cast of characters – Defendant Lekser, Defendant Savino, Defendant Fox, and Holden.

116.    Defendant Snowpoint did not question the relationship between Defendant Fox, a licensed attorney and Defendant Lekser, Defendant Savino, and Holden, the other key participants in the fraud nor did it inquire how Defendant Fox, an attorney, could serve, *inter alia,* as counsel for Upstream, Defendant Lekser (who supposedly borrowed funds from Upstream), and also counsel Holden, the tenant under the Fraudulent Lease.

117.    Instead, Defendant Snowpoint sought and received an opinion letter from Defendant Fox in his capacity as counsel for Defendant Lekser and Plaintiff by and through his supposed "attorney in fact" as to the legitimacy of Defendant Snowpoint's first lien position.

118.    Furthermore, Defendant Fox – the author of the opinion letter, requested that the three Fake Promissory Notes be listed as mandatory payoff items on the HUD-1 settlement statement and Defendant Snowpoint agreed to same.

## MISAPPROPRIATION OF RE-FINANCING PROCEEDS

119.   Defendant Fox directed that all of the proceeds net of closing costs and the $50,000 withheld by Defendant Snowpoint for future interest payments, be transferred to Defendant SFLG's IOLA client trust account.

120.   At least $309,000 was transferred into Defendant SFLG's IOLA Account on November 13, 2015 and within three (3) days, virtually the entire sum was delivered to Defendants Lekser and Savino.

121.   Defendant Lekser transferred some of the money out of the country including a wire of approximately $50,000 to a Hong Kong company affiliated with Defendant Savino.

122.   Notably, on its Face, the Fraudulent Power of Attorney does not authorize (i) Defendant Lekser to hire Defendant Fox on Plaintiff's behalf for the purpose of issuing an opinion to Defendant Snowpoint as to the legitimacy, *vel non,* of its first lien position and (ii) Defendant Fox to distribute post-closing funds in which Plaintiff has an interest to Defendant Lekser or anyone else.

123.   The purpose of the fraudulent re-financing transaction was to defeat Plaintiff's expectations under the Owner's Agreement and to invade the equity in the Property because Plaintiff had demanded accountability and transparency from Defendant Lekser.

124.   The fraud could not have been accomplished without the active assistance and/or participation of Defendants Lekser, Savino, Fox, Holmberg, Herweck and Silver.

125.   Furthermore, the fraud could not have been accomplished without deliberate indifference, willful blindness, carelessness, recklessness and/or intentional conduct by Defendants Snowpoint, SP Funding, and/or their agents and representatives.

## COUNT I

## SET ASIDE DEED OF TRUST, DECLARATORY RELIEF & QUIET TITLE

### (Plaintiff v. Lekser, Snowpoint Capital, LLC, & SP Funding 452, LLC)

126. Plaintiff incorporates the preceding paragraphs by reference as if set forth at length herein.

127. Plaintiff possesses an ownership interest in the Property, which he owns as co-equal joint tenants with rights of survivorship with Defendant Lekser.

128. As set forth at length *supra*, Defendant Lekser, in conjunction with her co-Defendants, refinanced the Property without Plaintiff's knowledge or consent through use of the Fraudulent Power of Attorney.

129. Relying on that Fraudulent Power of Attorney and ignoring indicia of fraud, including, *inter alia*, (1) irregularities in the Fraudulent Power of Attorney; (2) lack of documentation evidencing Defendant Lekser's authority to close; (3) material irregularities concerning the Fraudulent Lease evidencing that it was not reflective of a legitimate leasehold interest in the Property; (4) evidence of the interconnected nature of the relationships between Defendant Lekser, Defendant Savino, Defendant Fox, and Holden; and, (5) evidence of the fraudulent nature of the promissory notes between Defendant Lekser and Upstream, Defendant Snowpoint and its affiliate, Defendant SP Funding, lent money to Defendant Lekser in exchange for a fraudulently obtained Deed of Trust, which Defendant SP Funding recorded against the Property.

130. In addition, Defendants Snowpoint and SP Funding failed to perform a base level of acceptable due diligence in connection with the loan that they purportedly extended to Defendant Lekser, pursuant to which they obtained the Deed of Trust.

131.    Defendant SP Funding obtained the Deed of Trust without Plaintiff's consent, knowledge, or authorization.

132.    Defendants Snowpoint and SP Funding knew or should have known that they did not have Plaintiff's permission to grant the loan or to obtain the Deed of Trust.

133.    Plaintiff is entitled to a Decree declaring the Deed of Trust *void ab initio*.

WHEREFORE, Plaintiff, Konstantin Shvartser, demands judgment in his favor and requests the Court to set aside the November 11, 2015 Deed of Trust, declare the November 11, 2015 Deed of Trust void, and quiet title in the Property in Plaintiff's favor.

## COUNT II

## FRAUD

### (Plaintiff v. All Defendants)

134.    Plaintiff incorporates the preceding paragraphs by reference as if set forth at length herein.

135.    As set forth *supra*, Defendants Lekser, Savino, and Fox made misrepresentations of material fact through both affirmative statements and material omissions of fact and by relying on fraudulent documents for the purpose of obtaining a loan from Defendants Snowpoint and SP Funding without Plaintiff's knowledge, permission, or consent.

136.    To wit, Defendants Lekser, Savino, and Fox created and/or submitted the Fraudulent Power of Attorney, which Defendants Holmberg, Herweck, and Silver falsely and fraudulently attested to, as well as the Fraudulent Lease, which Defendant Fox created.

137.    Relying upon the Fraudulent Power of Attorney and Fraudulent Lease, Defendants Lekser and Savino applied for and obtained the aforementioned loan from Defendant Snowpoint and/or its affiliate, Defendant SP Funding.

138.    Defendants made these misrepresentations and omissions of fact either knowing that they were false and/or material, or acting with deliberate and reckless disregard as to their veracity and material nature.

139.    Defendants Snowpoint and SP Funding knew or should have known that the Fraudulent Power of Attorney and Fraudulent Lease were fraudulent documents, as evidenced by, *inter alia*, Sacks' opinion that the Fraudulent Power of Attorney could not be relied upon in connection with the loan, and Defendant Snowpoint's and/or Defendant SP Funding's direct knowledge that Holden was not in fact living in the Property pursuant to the Fraudulent Lease, which purportedly served as the basis for Defendant Snowpoint's and/or Defendant SP Funding's willingness to lend against the Property.

140.    Knowingly relying upon those misrepresentations, Defendants Snowpoint and SP Funding fraudulently represented to the Recorder of Deeds that they had the right to record the Deed of Trust against the Property.

141.    As a result of the Defendants' fraudulent acts, Plaintiff has been damaged insofar as, *inter alia*, Defendant Snowpoint and/or Defendant SP Funding wrongfully obtained a Deed of Trust against the Property in connection with the loan, which Defendant Lekser has since defaulted on, leading Defendant Snowpoint and/or Defendant SP Funding to initiate foreclosure proceedings against the Property.

142.    In addition, as a result of Defendants' combined fraudulent acts, Defendant Lekser obtained an $800,000 loan against the Property, approximately $400,000 of which was paid to Defendant Lekser or to Upstream pursuant to the fraudulent promissory notes.

143.   Accordingly, Defendant Snowpoint, through its affiliate, Defendant SP Funding, has unlawfully and improperly encumbered the Property, which has caused Plaintiff to suffer damage.

144.   Defendants' respective actions were performed knowingly, willfully, and maliciously for the purpose of benefiting themselves and harming Shvartser, giving rise not only to this cause of action, but also to an award of punitive damages.

WHEREFORE, Plaintiff, Konstantin Shvartser, demands judgment in his favor and against Defendants in an amount in excess of $75,000.00, along with an award of punitive damages, costs, and whatever other relief this Court deems necessary, just, and appropriate.

## COUNT III

## NEGLIGENCE

### (Plaintiff v. Snowpoint and SP Funding)

145.   Plaintiff incorporates the preceding paragraphs by reference as if set forth at length herein.

146.   Defendants Snowpoint and SP Funding owed duties to Plaintiff as lenders who purported (1) to underwrite a loan secured by the Property, which was owned by Plaintiff, (2) to loan money to Defendant Lekser in exchange for a security interest in the the Property, (3) to accept a Deed of Trust or other document(s) memorializing that security interest in the Property, and (4) to record said Deed of Trust against the Property.

147.   Defendants Snowpoint and SP Funding also owed duties to Plaintiff as an owner of the Property to ensure that they possessed a valid security interest in the Property before initiating foreclosure proceedings against the Property.

148.   As aforesaid, Defendants Snowpoint and SP Funding breached each of those duties to Plaintiff by, *inter alia*, (1) agreeing to loan money against the Property to Defendants

Lekser and Savino without obtaining proof of income from either Defendant Lekser or Defendant Savino; (2) failing to properly investigate the veracity of representations made to each or both of them by Defendant Lekser or Defendant Savino; (3) failing to verify the legitimacy of the Fraudulent Lease or to verify the alleged income stream thereunder, even though they purportedly relied upon that income stream in their underwriting process; (4) proceeding to underwrite the loan after obtaining evidence that the Fraudulent Lease was an invalid fiction; (5) failing to contact or attempt to contact Plaintiff regarding the loan; (6) relying upon the Fraudulent Power of Attorney, even after being advised that the Fraudulent Power of Attorney could not be used in connection with Defendant Lekser's desired refinancing and after receiving indicia that the Fraudulent Power of Attorney was an invalid document; (7) lending money to Defendant Lekser in face of all of the above, even after their own agents advised that additional documentation verifying the Fraudulent Power of Attorney would be necessary before financing; (8) failing to verify the validity of the Fake Promissory Notes; and (9) purporting to obtain and to accept a security interest in the Property in connection with that loan and recording said security interest against the Property through false and fraudulent means.

149.    Further, Defendants Snowpoint and SP Funding breached their duties to Plaintiff by failing to ensure the validity of their alleged security interest in the Property before initiating foreclosure proceedings against the Property.

150.    As a direct and proximate result of those breaches of duty, Plaintiff has suffered damage.

WHEREFORE, Plaintiff, Konstantin Shvartser, demands judgment in his favor and against Defendants in an amount in excess of $75,000.00, along with an award of punitive damages, costs, and whatever other relief this Court deems necessary, just, and appropriate.

## COUNT IV

### CONVERSION

**(Plaintiff v. Lekser, Savino, Fox and John Doe Defendants)**

151.    Plaintiff incorporates the preceding paragraphs by reference as if set forth at length herein.

152.    Defendants Lekser, Savino, Fox, and the John Doe Defendants knowingly converted Plaintiff's funds in the amount of no less than $309,000.

153.    Said Defendants' actions were willful, wanton, and outrageous thereby justifying the award of punitive damages.

WHEREFORE, Plaintiff, Konstantin Shvartser, demands judgment in his favor and against Defendants in an amount in excess of $75,000.00, along with an award of punitive damages, costs, and whatever other relief this Court deems necessary, just, and appropriate.

## COUNT V

### CIVIL CONSPIRACY

**(Plaintiff v. All Defendants Except Snowpoint and SP Funding)**

154.    Plaintiff incorporates the preceding paragraphs by reference as if set forth at length herein.

155.    Defendants Lekser, Savino and Fox conspired with each other to defraud Plaintiff and misappropriate funds from the re-fi transaction.

156.    In furtherance of their unlawful objectives, Defendants Lekser, Savino and Fox recruited and enlisted the assistance of Defendants Holmberg and Herweck, who aided and abetted the fraud by "witnessing" the Fraudulent Power of Attorney, and Defendant Silver who used his status as a Notary Public to give the fraud the appearance of legitimacy.

157.    Said Defendants' actions were willful, wanton and outrageous thereby justifying the award of punitive damages.

WHEREFORE, Plaintiff, Konstantin Shvartser, demands judgment in his favor and against Defendants in an amount in excess of $75,000.00, along with an award of punitive damages, costs, and whatever other relief this Court deems necessary, just, and appropriate.

## COUNT VI

## PROFESSIONAL NEGLIGENCE AND MISCONDUCT

## (Plaintiff v. Stephen Fox and S. Fox Law Group, P.C.)

158.    Plaintiff incorporates the preceding paragraphs by reference as if set forth at length herein.

159.    At all times relevant hereto Defendant Fox served as counsel to Plaintiff, Defendant Lekser, Holden, Upstream and Defendant Savino.

160.    At all times relevant hereto, a relationship of adversity existed between these parties.

161.    Defendant Lekser's interest, as a landlord, was adverse to those of Holden as a tenant under the Fraudulent Lease which Defendant Fox drafted.

162.    Upstream and Defendant Savino's interest as lenders were adverse to those of Defendant Lekser as a borrower under the Fraudulent Promissory Notes which Defendant Fox drafted.

163.    Defendant Lekser also accused Plaintiff of plotting with Sandlin against her, a fact that she communicated to Defendant Fox as early as the spring of 2015.

164.    Defendant Fox issued an opinion letter dated November 10, 2015, rendering an opinion on behalf of Plaintiff and Defendant Lekser as to the bona fides of the real estate transaction.

165.     Defendant Fox could not represent both Plaintiff and Defendant Lekser without a written waiver which Defendant Fox never sought or obtained.

166.     Defendant Fox was not authorized to represent Plaintiff in the real estate transaction relative to the Property or offer opinions on his behalf relative to the transaction.

167.     Defendant Fox could not rely on a dubious power of attorney presented by Defendant Lekser as a source of authority to represent Plaintiff as a client of Defendant SFLG.

168.     Defendant Fox was not authorized by the Fraudulent Power of Attorney or Plaintiff to receive the proceeds from the fraudulent re-financing into Defendant SFLG's IOLA account.

169.     Defendant Fox was not authorized by the Fraudulent Power of Attorney or Plaintiff to distribute the proceeds from the fraudulent re-financing to Defendant Lekser or Upstream.

170.     Defendant Fox committed multiple breaches of his ethical obligations to Plaintiff and otherwise deviated from reasonable standards of care and conduct relative to his role and handling of the transaction with Defendant Snowpoint.

171.     Subsequent to the closing on the transaction with Defendant Snowpoint, Defendant Fox willfully concealed the existence of the re-financing from Plaintiff.

172.     Specifically, less than a month after the re-financing closed, Defendant Fox in his own right and through local counsel, undertook to represent Defendant Lekser as a Plaintiff in a lawsuit that she filed against Sandlin in the Superior Court of Washington, D.C. (the "Sandlin Lawsuit") alleging various torts.

173.    In response to the lawsuit, Sandlin asserted counterclaims and third-party claims against Defendant Lekser and Plaintiff alleging that Sandlin had a possessory interest in the Property by virtue of his relationship and/or interactions with Lekser.

174.    In or around December 2015 and January 2016, when Plaintiff was involuntarily dragged into the Sandlin Lawsuit and made a third-party defendant, Defendant Fox agreed to represent both Plaintiff and Defendant Lekser in the Sandlin Lawsuit despite knowing that Defendants Fox and Lekser had just bilked Plaintiff in the Snowpoint re-financing.

175.    Defendant Fox filed pleadings on behalf of Plaintiff and Defendant Lekser, communicated with local counsel and opposing counsel, and rendered legal advice to both Plaintiff and Defendant Lekser relative to the Sandlin Lawsuit.

176.    All the while, Defendant Fox never once informed Plaintiff that (1) the Snowpoint re-financing had taken place and (2) the legal fees incurred for this needless lawsuit were being paid with the very funds that Defendants had misappropriated through the Snowpoint re-financing.

177.    Defendant Fox's silence enabled the other Defendants to further conceal and dissipate Plaintiff's assets and resulted in other harm to be established at trial.

178.    Defendant Fox, acting through Defendant SFLG, breached his client-facing obligations to Plaintiff and deviated from the standard of care and conduct imposed by common law and the applicable Rules of Professional Conduct.

179.    Said Defendants' actions were willful, wanton, and outrageous thereby justifying the award of punitive damages.

WHEREFORE, Plaintiff, Konstantin Shvartser, demands judgment in his favor and against Defendants in an amount in excess of $75,000.00, along with an award of punitive damages, costs, and whatever other relief this Court deems necessary, just, and appropriate.

## COUNT VII

### UNJUST ENRICHMENT

### (Plaintiff v. All Defendants)

180.    Plaintiff incorporates the preceding paragraphs by reference as if set forth at length herein.

181.    As heretofore alleged, Defendants have been unjustly enriched at the Plaintiff's expense.

182.    Equity and good conscience compel Defendants to compensate Plaintiff for the amounts by which they have been unjustly enriched.

WHEREFORE, Plaintiff, Konstantin Shvartser, demands judgment in his favor and against Defendants in an amount in excess of $75,000.00 and whatever other relief this Court deems necessary, just, and appropriate.

## COUNT VIII

### PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

### (Plaintiff v. Defendants Snowpoint and SP Funding)

183.    Plaintiff incorporates by reference the preceding paragraphs of this Complaint as if set forth at length herein.

184.    Defendants Snowpoint and SP Funding have initiated a non-judicial effort to foreclose on the Property.

185.    The non-judicial foreclosure is scheduled for March 1, 2018.

186.    It would be grossly inequitable for Defendants Snowpoint and SP Funding to foreclose on a Property that their professionals valued at $1,950,000 to satisfy a first mortgage lien the legitimacy of which is suspect and subject to claims asserted above.

187.    Accordingly, Plaintiff seeks a preliminary injunction enjoining said Defendants from proceeding with a foreclosure pending the outcome of this action and from seeking to enforce or foreclosure upon the Deed of Trust once Defendants' interest in the Property and its title are quieted.

WHEREFORE, Plaintiff, Konstantin Shvartser, seeks a decree in equity consistent with the above together with such other relief as may be deemed necessary, just, and appropriate.

## JURY DEMAND

188.    Plaintiff demands a jury trial before twelve (12) jurors on all counts at law.

## RESERVATION OF RIGHTS

189.    Plaintiff reserves the right to amend the Complaint pursuant to Fed.R.Civ.P. 15, to join additional parties and assert such additional claims based on information learned during discovery.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

/s/ Douglas Hibshman
Douglas P. Hibshman, Esquire
D. DC Bar No. 496255
1030 15th Street, N.W., Suite 380 East
Washington, DC 20005
Telephone:      (202) 461-3113
Facsimile:      (202) 461-3102
*dhibshman@foxrothschild.com*

/s/ Ely Goldin
Ely Goldin, Esquire

*Pro Hac Vice Pending*
10 Sentry Parkway, Suite 200
Post Office Box 3001
Blue Bell, PA 19422
Telephone:      (610) 397-6509
Facsimile:       (610) 397-0450
*egoldin@foxrothschild.com*